FILED

2013 Mar-13  PM 12:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LARRY RAPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-11-S-80-NE** |
| | ) | |
| **MORGAN COUNTY BOARD** | ) | |
| **OF EDUCATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Dr. Larry Raper, alleges that his employer, the Morgan County Board of Education, as well as the individual members and superintendent of the Board, engaged in age and gender discrimination in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000*e et seq.* ("Title VII"), Title IX of the Equal Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), and the Fourteenth Amendment.[1] Plaintiff claims that he was passed over for a promotion as the Board's Director of the Program for Exceptional Students in favor of a less-qualified, younger female.[2] Defendants have moved for summary judgment on all

---

[1] *See* doc. no. 4 (Second Amended Complaint) ¶¶ 33-45.

[2] *Id.* ¶ 20.

claims.[3]  Upon consideration of the parties' briefs, arguments, and evidentiary submissions, the motion for summary judgment will be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*).  Even so, "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin*

---

[3] Doc. no. 19 (Motion for Summary Judgment).

[4] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

*Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (alteration supplied); s*ee also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986).

## II.  FACTUAL BACKGROUND

The Morgan County Board of Education ("the Board") is a public school system in the State of Alabama.  Mike Tarpley, Jimmy Dobbs, Carolyn Wallace, Tom Earwood, Paul Holmes, Jeff McLemore, and Billy Rhodes are defendants in their official capacities as members of the Board.[5]  The Board's current superintendent, Bill Hopkins, is also named as a defendant in his official capacity.[6]   Former defendant Robert Balch served as superintendent of the Board from January 3, 2007 through December 31, 2010.[7]  The hiring decision in question was made during

---

[5] *See* doc. no. 4 (Second Amended Complaint) ¶¶ 5-11.  The second amended complaint named Kenneth Henson as a defendant, *id.* ¶ 9, but he later resigned from the Board and was replaced by Billy Rhodes.  Pursuant to Fed. R. Civ. P. 25(d), Rhodes was automatically substituted for Henson because the claims against Henson were made in his official capacity only.  *See* doc. no. 21 (Brief in Support of Summary Judgment), at 14 n.5.

[6] Doc. no. 4 (Second Amended Complaint) ¶ 4.

[7] Doc. no. 21 (Brief in Support of Summary Judgment), at 9 n.4.

3

Balch's tenure as superintendent.  Plaintiff's claims spring from his failure to receive in 2009 a promotion to the position of Director of the Program for Exceptional Students.

## A.     Plaintiff's Education and Experience

Plaintiff was born in 1949.[8]  He holds a B.S. degree in psychology from Athens State College, and an M.S. degree in special education from Alabama A&M University.[9]   Plaintiff's master's degree focused on learning disabilities.[10]   He received an education specialist degree from Jacksonville State University, and his doctorate in education administration from the University of Alabama.[11]  Plaintiff also possesses an "A" certification in educational administration and an "AA" certification in "special education, mild learning disabilities."[12]

The Board hired plaintiff as a special education teacher for the sixth, seventh,

---

[8] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 11-12.

[9] *See* doc. no. 21 (Brief in Support of Summary Judgment), at "Statement of Undisputed Facts" ¶ 20 (hereafter "Defendants' Facts"); *see also* doc. no. 20-1 (Deposition of Dr. Larry Raper), at 20-21; doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 1 (Ex. 1, Raper Resume).  The record is not clear what year plaintiff received his bachelor's and master's degrees, although he estimates that he received his bachelor's degree in 1987.  Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 20-21.

[10] Doc. no. 32 (Brief in Opposition to Summary Judgment), at "Additional Facts" ¶ 5 (hereafter "Plaintiff's Facts").  The court will cite to the parties' statements of fact, to the extent that those statements are undisputed.

[11] *See* Defendants' Facts ¶ 20; Plaintiff's Facts ¶ 6; *see also* doc. no. 20-1 (Deposition of Dr. Larry Raper), at 24-27; doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 1 (Ex. 1, Raper Resume).

[12] Defendants' Facts ¶ 20.

and eighth grades at Cotaco Junior High School in 1992.[13]  Before beginning his employment, plaintiff attended workshops on "corrective reading" for students with disabilities.[14]  Plaintiff's classes at Cotaco were "self-contained" — *i.e.*, the special education students were grouped together in one classroom.[15]  He also coached basketball at the school.[16]

Plaintiff moved from Cotaco Junior High School to Falkville High School in 2003, where he worked as a special education "inclusion" teacher for the seventh through twelfth grades.[17]  "Inclusion" teachers enter general education classes that contain students with and without disabilities, and "assist the regular teacher by helping [the] students with disabilities."[18]  Plaintiff also coached the boys' basketball team for seventh- and eighth-graders at Falkville.[19]  Plaintiff voluntarily transferred to Brewer High School in 2011, where he teaches inclusion classes for grades nine through twelve, and coaches basketball.[20]  During plaintiff's tenure in the Morgan County School System, he has taught students with emotional disorders, as well as

---

[13] *Id.* ¶ 1

[14] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 64-65.

[15] Defendants' Facts ¶ 2 & n.2.

[16] *Id.* ¶ 3.

[17] *Id.* ¶ 4.

[18] *Id.* at 1 n.3 (alteration supplied).

[19] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 51-52; *see also* Defendants' Facts  ¶ 6.

[20] Defendants' Facts ¶¶ 8, 10.

mental and physical disabilities.[21]  Plaintiff also has served children with autism and attended a workshop on that disorder.[22]

Plaintiff has written several "behavior intervention plans."[23]  Such plans are a system of incentives instituted to modify problematic student behavior.[24]  Plaintiff frequently utilized the "SETS database," in which individualized education programs ("IEPs") for students with disabilities are written and stored.[25]  IEPs are designed to identify and accommodate a disabled child's needs, with the goal of facilitating academic success in a standard educational environment.[26]  Plaintiff has drafted dozens of IEPs during his employment with the Board.[27]

## B.  Eva Junior High School Principal

Plaintiff applied for the principal position at Eva Junior High School in 2007.[28] Sometime before his interview, plaintiff encountered then-Superintendent Balch at a local Wal-Mart store.[29]  The two men struck up a conversation, during which Balch

---

[21] *See*, *e.g.*, Defendants' Facts ¶¶ 2, 9.

[22] Plaintiff's Facts ¶¶ 4, 28; doc. no. 20-1 (Deposition of Dr. Larry Raper), at 61-62.

[23] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 70-71.

[24] *Id.* at 71.

[25] *Id.* at 72-73.

[26] *Id.* at 74.

[27] *Id.* at 75.

[28] Plaintiff's Facts ¶ 7.

[29] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 133-34.

commented that plaintiff was "getting on [up there] in age," and asked "how long do you think you're going to be around?"[30]  Plaintiff responded that he intended to "be around as long as [his] health is good."[31]

Balch subsequently interviewed plaintiff for the Eva position.[32]  Plaintiff offered Balch a copy of his resume at the beginning of the interview, but Balch declined it, saying that he was familiar with plaintiff's qualifications based on their prior conversations.[33]  At one point, Balch asked plaintiff where he saw himself "five years from now."[34]  Plaintiff initially responded that he thought the question might suggest an "underlying motive" regarding age, and then answered that he saw himself "doing a great job" as the Eva principal five years into the future.[35]

Ultimately, Balch recommended Patrick Patterson for the position.[36]  Patterson then was thirty-five years old, while plaintiff was fifty-eight.[37]

## C.    Director of the Program for Exceptional Students

---

[30] *Id.* at 133 (alteration supplied).

[31] *Id.* (alteration supplied).

[32] Plaintiff's Facts ¶ 7.

[33] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 28, 133.

[34] *Id.* at 133.

[35] *Id.* at 134.

[36] *See* Plaintiff's Facts ¶ 8.

[37] *Id.*; doc. no. 20-1 (Deposition of Dr. Larry Raper), at 28 (noting that plaintiff was born in 1949).

Board employee Venita Jones served as the Director of the Program for Exceptional Students ("the Director position" or "the position") from 2004 until her retirement at the end of the 2008-2009 school year.[38]  The Director oversees the Board's county-wide program that provides services to both special needs and gifted students.[39]  For instance, the Director supervises all special education personnel, monitors budgetary needs, and is responsible for organizing parent meetings, eligibility meetings, and student referrals.[40]  The Board posted an opening for the position, along with a job description and salary schedule, on June 1, 2009.[41]  The Board maintains a hiring policy for all positions that states:  "All other things being equal, favorable consideration will be given to current employees who want to transfer into [a] vacant position."[42]

The minimum, mandatory qualifications for the Director position were:  a master's degree; a superintendent/principal certification, or an "A" certification in special education, psychometry, school psychology, or counseling; and five years of

---

[38] Defendants' Facts ¶ 11.

[39] Plaintiff's Facts ¶ 10.

[40] Doc. no. 20-3 (Deposition of Robert Balch), at 16.

[41] Defendants' Facts ¶ 12; *see also* doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 12-17 (Ex. 7, Job Posting, Description, and Salary Schedule).

[42] Doc. no. 20-3 (Deposition of Robert Balch), at ECF 27 (Ex. 3, Hiring Policy) (alteration supplied).

"successful work experience in some area of special education."[43]   Additionally,

teaching experience with gifted students was desired because, under Alabama law,

special education programs encompass gifted education.[44]   The job description

contained twenty-six duties and responsibilities, including:  project enrollment and

identify staff needs; assist with employee orientation; supervise special education

teachers and psychometrists; attend special education conferences; plan, implement,

and schedule special education programs; further awareness of and compliance with

legal standards for special education; and coordinate with the Department of

Transportation to identify transportation policies that fit students' needs.[45]

Nine individuals applied for the position.[46]   Balch conducted interviews with

six applicants, including plaintiff.[47]   Each interview lasted between fifteen and thirty

minutes.[48]

### 1.    Plaintiff's qualifications and interview

When the Director position became available, plaintiff asked Balch how to

---

[43] Defendants' Facts ¶ 12; *see also* doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 13 (Ex. 7, Job Posting, Description, and Salary Schedule).

[44] Defendants' Facts ¶¶ 14-15; doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 13 (Ex. 7, Job Posting, Description, and Salary Schedule).

[45] Doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 13-15 (Ex. 7, Job Posting, Description, and Salary Schedule).

[46] Defendants' Facts ¶ 16.

[47] *Id.* ¶ 37; doc. no. 20-3 (Deposition of Robert Balch), at 31-32, 53.

[48] Defendants' Facts ¶ 38.

9

apply for the job.[49]   Balch told him to submit a request for transfer form, which plaintiff promptly did.[50]   At the time of his application, plaintiff was sixty years old and had been employed by the Board for seventeen years.[51]   He met the minimum required qualifications for the position, although he did not have the desired qualification of experience with gifted students.[52]

Balch interviewed plaintiff on June 30, 2009.[53]   Plaintiff brought his resume to the interview.[54]   Balch did not ask for plaintiff's resume, however, and plaintiff did not volunteer it.[55]   Balch later testified that he assumed that candidates would voluntarily submit a resume in order to demonstrate their qualifications.[56] Conversely, plaintiff did not offer his resume, because Balch had declined it during the 2007 interview for the Eva principal position on the ground that he was familiar with plaintiff's qualifications.[57]

Plaintiff and Balch did not recall many details of plaintiff's interview during

---

[49] Doc. no. 20-3 (Deposition of Robert Balch), at 49.

[50] *Id.*; doc. no. 20-1 (Deposition of Dr. Larry Raper), at 151-52; *see* doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 18 (Ex. 8, Voluntary Transform Form).

[51] Plaintiff's Facts ¶¶ 16, 17.

[52] Defendants' Facts ¶ 20; doc. no. 20-1 (Deposition of Dr. Larry Raper), at 70 (admitting that he has never taught gifted students and that he never took courses on gifted education).

[53] *See* doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 19 (Ex. 9, Interview Schedule).

[54] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 29.

[55] *Id.*; doc. no. 20-3 (Deposition of Robert Balch), at 48.

[56] Doc. no. 20-3 (Deposition of Robert Balch), at 48.

[57] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 28-29.

their respective depositions.[58]   Balch assumed that he asked plaintiff several standard questions, such as his current position, duties, and experience in different fields of special education.[59]   Both men agreed that Balch tested plaintiff's knowledge of a recent Supreme Court decision involving special education, although neither could recall the specific case.[60]   Plaintiff admitted that he was not aware of the case.[61]

Balch described plaintiff's interview as "subpar at best."[62]   Still, plaintiff felt that Balch conducted the interview in a fair fashion, and that he did not demonstrate a discriminatory animus.[63]

### 2.   Lana Tew's education and experience

Lana Tew also applied for the Director position.[64]   She was thirty-eight years old at the time of her application.[65]   She had majored in emotional conflict and mental retardation at Jacksonville State University, where she received her B.S. degree in 1996.[66]   She also earned an M.S. degree in educational administration from the

---

[58] *See id.* at 162-64; doc. no. 20-3 (Deposition of Robert Balch), at 21-22.

[59] Doc. no. 20-3 (Deposition of Robert Balch), at 22-23.

[60] *Id.* at 22-24; doc. no. 20-1 (Deposition of Dr. Larry Raper), at 162-64.

[61] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 162; doc. no. 20-3 (Deposition of Robert Balch), at 24.

[62] Doc. no. 20-3 (Deposition of Robert Balch), at 23.

[63] Defendants' Facts ¶ 45

[64] Plaintiff's Facts ¶ 12.

[65] *Id.* ¶ 14.

[66] Defendants' Facts ¶ 17; doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 20-21 (Ex. 10, Tew Resume).

University of Montevallo in 2002.[67]  She has held an "A" certification in educational administration since 2002.[68]  Unlike plaintiff, she had experience teaching gifted students.[69]

Tew had been either a special education teacher or special education "resource" teacher for thirteen years when she applied for the Director position.[70]  She began her career in 1996 as a "self-contained" special education teacher at Columbiana Middle School in Shelby County, Alabama.[71]  She assumed the same position in 1998 at Holtville High School in Elmore County, Alabama, but soon returned to Columbiana Middle School as a gifted education teacher from 1999 to 2001.[72]  Tew then accepted a position as a special education teacher with the Talladega County school system in 2001.[73]  That system promoted Tew to "preschool/elementary resource teacher" in 2004, a post that she held when the Director position in Morgan County became

---

[67] Defendants' Facts ¶ 17; doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 20-21 (Ex. 10, Tew Resume).

[68] Defendants' Facts ¶ 17.

[69] *Id.* ¶¶ 19, 36.

[70] *Id.* ¶ 23.

[71] Doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 20-21 (Ex. 10, Tew Resume); doc. no. 20-6 (Affidavit of Lana Tew) ¶ 4.

[72] Doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 20-21 (Ex. 10, Tew Resume); doc. no. 20-6 (Affidavit of Lana Tew) ¶¶ 5-6.

[73] Doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 20-21 (Ex. 10, Tew Resume); doc. no. 20-6 (Affidavit of Lana Tew) ¶ 7.

available.[74]  As a resource teacher, Tew helped Talladega County's Special Education Director provide system-wide services to special needs students.[75]   Accordingly, Tew's duties as a resource teacher varied from those of a traditional special education teacher, as they were frequently administrative in nature.[76]  She mediated disputes and complaints regarding the county's special education program for preschool through sixth grade.[77]  If a complainant contacted her superior directly, Tew would often be dispatched to solve the problem.[78]   She worked with the county's hearing-impaired students to ensure that their assistive equipment functioned properly, and coordinated with parents, organizations, and outside entities to procure teacher training and student services.[79]  Tew organized "transitional" meetings for families whose children needed special testing before enrolling in the local school system.[80]  She collaborated with principals and directors throughout Talladega County to resolve special education issues as they arose.[81]

---

[74] Doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 20-21 (Ex. 10, Tew Resume); doc. no. 20-6 (Affidavit of Lana Tew) ¶ 8.

[75] Doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 20-21 (Ex. 10, Tew Resume); doc. no. 20-4 (Deposition of Lana Tew), at 49.

[76] Doc. no. 20-4 (Deposition of Lana Tew), at 56-57.

[77] *Id.* at 49.

[78] *Id.*

[79] *Id.* at 49-52.

[80] *Id.* at 50-51.

[81] *Id.* at 51-52.

Those duties, along with Tew's additional training, provided Tew with experience in many areas that plaintiff lacked, as plaintiff had served only as a classroom special education teacher.[82]   Tew participated in several professional activities that plaintiff had not, including:  receiving Alabama Reading Initiative training; attending autism training sessions and workshops at Auburn University, the University of Alabama, and the Mid South Reading and Writing Institute; taking autistic students to the Riley Center for evaluation; and participating in dyslexia training in order to identify different types of the disorder.[83]   Additionally, Tew had coordinated and collected data for a standardized test given to incoming and outgoing preschool students; utilized a speech-improvement lab; operated "augmentative communication devices" for non-verbal students and sound amplification systems for hearing-impaired students; and conducted meetings to determine whether students were eligible for special education.[84]

### 3.   Tew's interview

Tew's education and experience qualified her for the Director position.[85]  Balch interviewed Tew on June 30, 2009.[86]  Unlike plaintiff, she had provided a resume

---

[82] Defendants' Facts ¶¶ 24, 26.

[83] *Id.* ¶¶ 27-28, 30, 34

[84] *Id.* ¶¶ 29, 31-33, 35.

[85] *Id.* ¶ 17.

[86] *See* doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 19 (Ex. 9, Interview Schedule).

prior to her interview as part of her application.[87]   Balch asked Tew about her experience and work history.[88]   He inquired whether she was familiar with the Individuals with Disabilities Education Act ("IDEA"), which she was.[89]   Tew recounted her previous dealings with legal issues — "due process complaints" — that related to the IDEA.[90]  She mentioned that autism is the most litigated issue in special education law, and referenced then-recent legal cases involving special education, although she could not recall the exact cases during her deposition testimony.[91]

Balch noticed from Tew's resume that she had extensive experience in numerous areas of special education, such as autism, assistive technology, and corrective reading programs.[92]  Balch also saw that Tew had undergone several types of training related to enhancing the literacy skills of students with disabilities.[93]  Her resume indicated her experience with different kinds of disabilities, and highlighted her familiarity with educational tools and programs used by and designed for special

---

[87] Doc. no. 20-5 (Affidavit of Rober Balch) ¶ 6; doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 20-21 (Ex. 10, Tew Resume).

[88] Doc. no. 20-4 (Deposition of Lana Tew), at 14.

[89] Id.

[90] Id. at 17-18.

[91] Id. at 36-37, 39.

[92] Doc. no. 20-3 (Deposition of Robert Balch), at 55.

[93] Defendants' Facts ¶ 42.

education students.[94]

### 4.    Balch's recommendation and the Board's vote

Balch recommended Tew to the Board for the Director position at the conclusion of the interview process.[95]   Balch based his recommendation on the experience demonstrated by Tew's application and resume, and her superior interview performance.[96]   She had extensive training in programs and equipment used for students with disabilities.[97]   She demonstrated a firm grasp of a variety of special education issues, such as IEPs, behavior plans, professional development for teachers, eligibility meetings, data collection, autism education, and instruction for gifted students.[98]   Moreover, Tew exhibited a firm grasp of special education law in her interview.[99]   In sum, Tew's interview was "exceptional" and, along with her resume, demonstrated to Balch that she was an "impressive applicant on all issues."[100]

Further, Balch testified that he would not have recommended plaintiff to the Board over other candidates, because Raper did not provide a resume, had less

---

[94] *Id.*

[95] *Id.* ¶¶ 41, 47.

[96] Doc. no. 20-5 (Affidavit of Robert Balch) ¶ 8.

[97] *See*, *e.g.*, Defendants' Facts ¶¶ 27, 30-33; doc. no. 20-3 (Deposition of Robert Balch), at 65-66.

[98] Doc. no. 20-5 (Affidavit of Robert Balch) ¶ 13; *see also* Defendants' Facts ¶¶ 28-29, 35-36.

[99] Doc. no. 20-5 (Affidavit of Robert Balch) ¶ 14.

[100] *Id.*; doc. no. 20-3 (Deposition of Robert Balch), at 61.

knowledge about certain areas of special education, and was not aware of recent developments in special education law, and because other candidates had better interviews.[101]   Additionally, Balch felt that the Board's policy of giving favorable consideration to current employees over outside applicants when all other factors were equal did not apply, because he did not perceive plaintiff and Tew as equally qualified.[102]

On either the afternoon or evening before the Board voted on Balch's recommendation, plaintiff received a telephone call from Board member (and former defendant) Betty Hackett.[103]   Hackett informed plaintiff that, in her opinion, he was more qualified than Tew and, therefore, she would be voting against Balch's recommendation.[104]   Plaintiff could not remember the exact details of their conversation, but he recalled an opaque comment from Hackett about how "we" are getting older and that people "take[] us [less] seriously."[105]   Plaintiff interpreted Hackett's comment "[m]ainly [as] referring to her[self]."[106]

The Board approved Balch's recommendation of Tew on July 9, 2009, by a

---

[101] Doc. no. 20-5 (Affidavit of Robert Balch) ¶ 16; Defendants' Facts ¶ 46.

[102] Doc. no 20-3 (Deposition of Robert Balch), at 60-61; *see also id.* at ECF 27 (Ex. 3, Hiring Policy).

[103] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 189.

[104] *Id.* at 189-90.

[105] *Id.* at 202-03 (alterations supplied).

[106] *Id.* at 203 (alterations supplied).

vote of five to two.[107]   Board members Hackett and Kenneth Henson voted against the

recommendation.[108]   Plaintiff learned of the Board's decision the next day from a

report in the local paper, as well as an official letter from Balch.[109]   Plaintiff does not

claim that the individual Board members acted with discriminatory intent; instead, he

maintains that they supported Balch's recommendation without considering plaintiff's

qualifications.[110]

## III.  DISCUSSION

### A.    Plaintiff's Abandoned Claims

Plaintiff has explicitly abandoned his claims for gender discrimination under

Title VII, Title IX, and the Fourteenth Amendment by way of 42 U.S.C. § 1983.[111]

Consequently, summary judgment is due to be granted on the claims alleged in

Counts II and III of his complaint.   The individual defendants also are due to be

dismissed from the action because no claims remain against them.   Plaintiff's only

remaining claim is against the Board for age discrimination.

### B.    Plaintiff Has Not Provided Direct Evidence of Age Discrimination

---

[107] Defendants' Facts ¶ 48

[108] Plaintiff's Facts ¶ 19; *see also* doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 31
(Ex. 14, Minutes of Board Meeting).

[109] Defendants' Facts ¶ 49.

[110] *Id.* ¶ 62.

[111] Doc. no. 32 (Brief in Opposition to Summary Judgment), at 4 n.1; *see also* doc. no. 33
(Reply Brief in Support of Summary Judgment), at 3.

A plaintiff may prove an ADEA claim for age discrimination by using direct evidence. *See Mora v. Jackson Memorial Foundation, Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010). Plaintiff argues that three facts provide direct evidence of age discrimination: *i.e.*, Balch's 2007 remark at the Wal-Mart store that plaintiff was "getting on [up there] in age," and his inquiry as to how long plaintiff thought he was "going to be around"; Balch's question during plaintiff's 2007 interview for the Eva position about where plaintiff saw himself in five years; and Board member Hackett's statements on the eve of the Board's vote on the Director position that plaintiff was more qualified than Tew, and that older people are taken less seriously.[112]

"Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). As the Eleventh Circuit has frequently noted, "only the most blatant remarks, whose intent could mean *nothing other than to discriminate* on the basis of some impermissible factor constitute direct evidence of discrimination. If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (emphasis supplied) (internal citations and quotation marks omitted).

---

[112] *See* doc. no. 32 (Brief in Opposition to Summary Judgment), at 13, 16-17.

19

Plaintiff has not presented direct evidence of discrimination.  Direct evidence must connect the employer's or decision-maker's discriminatory attitude with the *relevant* employment decision.  *Wright v. Southland Corp.*, 187 F.3d 1287, 1294 (11th Cir. 1999); *see also Ritchie v. Industrial Steel, Inc.*, 426 F. App'x 867, 871-72 (11th Cir. 2011) (*per curiam*).  Balch's remarks to plaintiff related to the *Eva principal position* and occurred two years *before* the Director position became available.  Additionally, Balch's comments do not rise to the level of explicitness present in cases that have found direct evidence to exist:  *e.g.*, "[we] didn't want to hire any old pilots," *Mora*, 597 F.3d at 1204-05 (alteration supplied); "fire Early – he is too old," *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 854-55 (11th Cir. 2010); "Ritchie is too old to work as a truck driver," *Ritchie*, 426 F. App'x at 871-72; and "we will get . . . someone younger to take [plaintiff's] place," *Newsome v. KwangSung America, Corp.*, 798 F. Supp. 2d 1291, 1297-98 (M.D. Ala. 2011) (alteration supplied).  *See also, e.g., Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997) (compiling examples of statements constituting direct evidence).  Instead, Balch's statements merely alluded to plaintiff's age without expressly indicating that it would factor into Balch's decision.

Board member Hackett's comments to plaintiff were related to the relevant employment decision.  However, plaintiff admitted that he interpreted her remark

about older individuals not being taken seriously as referring to herself, rather than referring to him.[113]   Further, although her statements are relevant to the issue of discriminatory intent, they suffer from the same lack of directness as Balch's questions.   Hackett's statements may suggest, in a roundabout fashion, that some members of the Board held a discriminatory motive, but that is not the only possible construction of her comments.   Hence, they are circumstantial evidence.   *See Wilson*, 376 F.3d at 1086.

## C.   The *McDonnell Douglas* Framework

Traditionally, the Eleventh Circuit has applied the *McDonnell Douglas* framework to ADEA claims that rely on circumstantial evidence.   Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case. *See*, *e.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*) ("One method a plaintiff can use to establish a *prima facie* case for an ADEA violation is by showing that he (1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual.").   "If a plaintiff establishes a *prima facie* case . . . the employer must articulate a legitimate, nondiscriminatory rationale for the [contested employment action].   If the employer

---

[113] Doc. no. 20-1 (Deposition of Dr. Larry Raper), at 203.

21

does so, the burden shifts back to the plaintiff to prove that the employer's asserted reason is pretextual." *Young v. General Foods Corp*., 840 F.2d 825, 828 (11th Cir. 1988) (alteration supplied); *see also Chapman*, 229 F.3d at 1024.

The parties' briefs suggest that the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), either repudiated the application of the *McDonnell Douglass* framework to ADEA cases, or provided an additional standard for such cases.[114]   In point of fact, however, the majority opinion in *Gross* (a 5-4 decision) addressed a narrow question — *i.e.*, "whether a plaintiff must present direct evidence of age discrimination in order to obtain a mixed-motives jury instruction in a suit brought under the [ADEA]," *id*. at 169-70 (alteration supplied) — and held that

> a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action.  The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision.

*Id*. at 180.  The majority's opinion in *Gross* noted that the Court had not "definitively decided" whether the *McDonnell Douglas* framework "is appropriate in the ADEA

---

[114] Doc. no. 32 (Brief in Opposition to Summary Judgment), at 17-18 (suggesting that *Gross* eliminated the application of *McDonnell Douglas* to ADEA cases); doc. no. 21 (Brief in Support of Summary Judgment), at 28-29 (providing analysis under the *Gross* standard after discussing the *McDonnell Douglas* framework).

context." *Id.* at 175 n.2.[115]  Therefore, until such time as Congress or the Supreme

Court provide an unequivocal answer to that question, this court will follow binding

authorities, such as the Supreme Court's opinion in *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133 (2000), which recognized the widespread application of

the *McDonnell Douglas* framework to ADEA claims that are based on circumstantial

evidence.  *Id.* at 141-42 (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517

U.S. 308, 311 (1996) (assuming that *McDonnell Douglas* analytical framework

---

[115] Specifically, the majority opinion in *Gross* appended this footnote to the textual statement observing that, as a result of the 1991 Congressional amendments to Title VII and the ADEA, the Court's interpretation of the ADEA was not governed by Title VII decisions such as *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989):

> Justice STEVENS argues that the Court must incorporate its past interpretations of Title VII into the ADEA because "the substantive provisions of the ADEA were derived *in haec verba* from Title VII," *post*, at [129 S. Ct.] 2354 (dissenting opinion) (internal quotation marks omitted), and because the Court has frequently applied its interpretations of Title VII to the ADEA, see *post*, at 2354-2356.  But the Court's approach to interpreting the ADEA in light of Title VII has not been uniform.  In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 124 S. Ct. 1236, 157 L. Ed. 2d 1094 (2004), for example, the Court declined to interpret the phrase "because of . . . age" in 29 U.S.C. § 623(a) to bar discrimination against people of all ages, even though the Court had previously interpreted "because of . . . race [or] sex" in Title VII to bar discrimination against people of all races and both sexes, *see* 540 U.S., at 584, 592, n.5, 124 S. Ct. 1236.  And the Court has not definitively decided whether the evidentiary framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), utilized in Title VII cases is appropriate in the ADEA context.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996).  In this instance, it is the textual differences between Title VII and the ADEA that prevent us from applying *Price Waterhouse* and *Desert Palace* to federal age discrimination claims.

*Gross*, 557 U.S. at 170 n.2.

23

applies to ADEA claims based on circumstantial evidence)); *see also*, *e.g.*, *Chapman*, 229 F.3d at 1024 (applying *McDonnell Douglas* framework to ADEA claim based on circumstantial evidence); *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 656 (11th Cir. 1998) (same); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (same); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (same); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217 (11th Cir. 1993) (same); *Mitchell v. Worldwide Underwriters Insurance Co.,* 967 F.2d 565, 566 (11th Cir. 1992) (same); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991) (same); *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987) (same).

Since June 18, 2009, the date on which the *Gross* decision was handed down, the Eleventh Circuit has not issued a published opinion that directly addresses the question of whether the *McDonnell Douglas* framework applies to ADEA actions. Even so, the Circuit's unpublished, post-*Gross* decisions continue to utilize the *McDonnell Douglas* standard. *See*, *e.g.*, *Ostrow v. GlobeCast America Inc.*, 489 F. App'x 433, 435-36 (2012) (*per curiam*) (applying *McDonnell Douglas* because it is consistent with *Gross*'s "but-for" standard); *Horn v. United Parcel Services, Inc.*, 433

F. App'x 788, 793 (11th Cir. 2011) (*per curiam*) (same).[116]  Accordingly, this court shall do the same.

The Board conceded, for purposes of summary judgment, that plaintiff has proved a *prima facie* case of age discrimination.[117]  As a result, the burden shifted to the Board to articulate legitimate, non-discriminatory reasons for selecting Tew over plaintiff.  *See*, *e.g.*, *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001). The Board's burden of production is "exceedingly light."  *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004).  The Board presented sufficient evidence to satisfy that burden by stating that Tew had superior training and experience, and her interview performance was superior to plaintiff's.[118]

Thus, the burden shifted back to plaintiff to present evidence (including evidence establishing his *prima facie* case) showing that the Board's stated reasons for hiring Tew were not the real reasons, but were merely a pretext for intentional

---

[116] *See also Mitchell v. City of Lafayette*, No. 12-12556, 2013 WL 310063, *1, 4 (11th Cir. Jan. 28, 2013) (*per curiam*) (ostensibly applying both *McDonnell Douglas* and *Gross*, but functionally treating plaintiff's inability to satisfy *McDonnell Douglas* as failure to prove "but-for" causation under *Gross*); *Vahey v. Philips Electronics North America Corp.*, 461 F. App'x 873, 874, 876 (11th Cir. 2012) (*per curiam*) (same); *Ehrhardt v. Haddad Restaurant Group, Inc.*, 443 F. App'x 452, 454, 456 (11th Cir. 2011) (*per curiam*) (same).

[117] Doc. no. 21 (Brief in Support of Summary Judgment), at 18 n.7.

[118] *See* doc. no. 21 (Brief in Support of Summary Judgment), at 18-19 (stating the Board's reasons for hiring Tew); Defendants' Facts ¶¶ 22-24, 26-36, 42, 46 (proving factual support for the Board's reasons); doc. no. 20-3 (Deposition of Robert Balch), at 61, 65-66 (same); doc. no. 20-4 (Deposition of Lana Tew), at 17-18, 36-37, 39, 49-52 (same); doc. no. 20-5 (Affidavit of Robert Balch) ¶¶ 8, 13-14 (same).

discrimination on the basis of plaintiff's age. *See*, *e.g.*, *Combs v. Plantation Patterns*, 106 F.2d 1519, 1528 (11th Cir. 1997). To bear that burden, plaintiff cannot simply quarrel with the Board's stated reasons, but must meet them head on and rebut them. *Wilson*, 376 F.3d at 1088. He must show that *each* of the proffered reasons are false, *and* that discrimination was the real reason for the Board's decision. *See Brooks v. County Commissioner of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006); *Jackson v. State of Alabama Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005).

Further, when, as here, a defendant claims it hired the more qualified candidate, the plaintiff cannot show pretext "by simply arguing or even by showing that he was better qualified than the [individual] who received the position he coveted." *Brooks*, 446 F.3d at 1163 (quoting *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000)) (alteration supplied). Instead, the plaintiff must "show that the disparities between the successful applicant's and [his] own qualifications were '*of such weight and significance* that *no reasonable person*, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Brooks*, 446 F.3d at 1163 (quoting *Cooper*, 390 F.3d at 732, and citing *Ash v. Tyson Foods*, 546 U.S. 454,

457 (2006)) (emphasis supplied).[119]

Plaintiff cannot meet that standard.  Plaintiff is correct that he had four more years of teaching experience than Tew, and that he had attained a higher level of education.[120]  But those are only two data points picked out of an array of qualities.  As recounted in Part II.C.2. of this opinion, *supra*, there is extensive evidence that Tew had training and experience in areas that plaintiff lacked.[121]

Plaintiff attempts to minimize the significance of Tew's administrative experience as a resource teacher in Talladega County by arguing that "every senior ranking classroom instructor" performs similar duties.[122]  The facts do not support that argument.  The record shows that Tew performed administrative duties as a resource teacher that plaintiff did not undertake in his role as a classroom teacher:

---

[119] In *Ash*, the Supreme Court disapproved of the standard previously employed by the Eleventh Circuit: *i.e.*, that "[p]retext can be established through comparing qualifications only when 'the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face.'" *Id.* at 456-57 (alteration supplied) (internal citations omitted).  Even so, the Supreme Court approved of the standard that this Circuit employed elsewhere:  *i.e.*, "that 'disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  *Id.* at 457 (citing *Cooper*, 390 F.3d at 732).

[120] *See* Defendants' Facts ¶¶ 22-23; Plaintiff's Facts ¶¶ 24, 26; *see also* doc. no. 21 (Brief in Support of Summary Judgment), at 23 n.10

[121] *See* Defendants' Facts ¶¶ 24, 26-36; *compare* doc. no. 20-4 (Deposition of Lana Tew), at 49-52, 56-58; doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 20-21 (Ex. 10, Tew Resume); doc. no. 20-6 (Affidavit of Lana Tew) ¶ 9 *with* doc. no. 20-1 (Deposition of Dr. Larry Raper), at 61-70; doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 1 (Ex. 1, Raper Resume).

[122] Doc. no. 32 (Brief in Opposition to Summary Judgment), at 24; *see also* doc. no. 20-1 (Deposition of Dr. Larry Raper), at 182-83.

27

*e.g.*, mediating disputes and complaints about the county's special education program; providing system-wide special education services; training new teachers; ensuring that assistive equipment functioned properly; coordinating with parents, organizations, and outside entities to procure teacher training and student services; and collaborating with principals and directors throughout the county.[123]

Plaintiff highlights his doctoral degree, and contrasts it to the fact that Tew had attained only a master's degree.[124]  But a doctorate was not a required, or even a desired, qualification for the Director position.[125]  To the extent that plaintiff believes a doctoral degree *should* have been a qualification, or that Balch and the Board should have given greater weight to the fact that he held such a degree, he merely questions their business judgment.  *See Chapman*, 229 F.3d at 1030.  Conversely, experience with gifted students *was* a preferred qualification, and one that Tew possessed, but plaintiff lacked.[126]

Those facts support the Board's position that Tew was the more qualified

---

[123] *See* doc. no. 20-4 (Deposition of Lana Tew), at 49-52, 56-58; *compare* doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 1 (Ex. 1, Raper Resume) *with id.* at ECF 20-21 (Ex. 10, Tew Resume).

[124] Doc. no. 32 (Brief in Opposition to Summary Judgment), at 24, 26.

[125] *See* doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 13 (Ex. 7, Job Posting, Description, and Salary Schedule).

[126] Defendants' Facts ¶¶ 14-15, 36; doc. no. 20-1 (Deposition of Dr. Larry Raper), at 70; doc. no. 20-2 (Exhibits to Raper Deposition), at ECF 13 (Ex. 7, Job Posting, Description, and Salary Schedule); doc. no. 20-6 (Affidavit of Lana Tew) ¶ 6.

candidate, as well as Balch's conclusion that the Board's policy of favoring internal candidates did not apply, because the qualifications of the candidates were not equal. Even assuming that plaintiff's doctoral degree and four additional years of teaching experience rendered him more qualified than Tew, he cannot show that the disparities between them were "of such weight and significance that *no* reasonable person" could have selected Tew. *Brooks*, 446 F.3d at 1163 (emphasis supplied).

The Board's second proffered reason for hiring Tew was that her interview was superior. Plaintiff must show that *each* legitimate, non-discriminatory reason for hiring Tew was pretextual. *See Brooks*, 446 F.3d at 1163. Because he has not done so regarding the Board's contention that Tew was more qualified, the court need not address plaintiff's argument that hiring Tew on the basis of her superior interview was pretextual.

## IV.  CONCLUSION AND ORDER

For all the foregoing reasons, defendants' motion for summary judgment is GRANTED,[127] and all claims are DISMISSED with prejudice. Costs are taxed to plaintiff. The clerk is directed to close this file.

**DONE** and **ORDERED** this 13th day of March, 2013.

---

[127] Doc. no. 19 (Motion for Summary Judgment).

29

_____
United States District Judge